## 24233. DAVIS v. DAVIS.

SUBMITTED SEPTEMBER 12, 1967—DECIDED OCTOBER 5, 1967.

*Merritt & Pruitt, Glyndon C. Pruitt,* for appellant.
*Webb & Fowler, William G. Tanner,* for appellee.

MOBLEY, Justice. Raymond H. Davis brought a petition for divorce against Helen M. Davis on the ground of cruel treatment. The defendant filed an answer denying the allegations of cruel treatment, and a cross action alleging acts of cruelty of the plaintiff. The jury found a verdict for the plaintiff. The appeal is from the denial of the defendant's motion for new trial on the usual general grounds, and the only question made by the enumeration of errors is whether the evidence showed cruel treatment of the plaintiff by the defendant.

In his petition the husband alleged that his wife "constantly quarreled, fussed and nagged," but his testimony showed that he did not separate from his wife because of constant quarreling,

fussing, and nagging. His testimony showed conclusively that any fussing and quarreling was participated in by both, and neither party could be granted a divorce under this testimony. *Code* § 30-109. He testified in part as follows: "Q. Was there any quarreling or fussing in your home? A. Yes, sir, there was plenty of it. Q. On whose part? A. On both parts. Q. On both? A. Yes, sir." He stated further: "I'd say she raised hers [her voice] as much as I did mine." When questioned as to whether he frequently got mad during their married life, he replied: "Not a bit madder than she did. I'd say it is as much her fault as mine."

The husband stated that the acts which caused him to separate from his wife were as follows: "She couldn't come home from work and cook for my child and myself, and finally stayed out later and later and finally stayed out until 1 o'clock one morning and that is when it ended. She constantly got worse and worse and worse." When asked what he meant by this statement, he replied: "By staying out. She couldn't come home and cook and wash. I would do the washing and her mother would come to my house and do the ironing to keep me from going to work in wrinkled clothes." In answer to the question, "What exactly did she do . . . about keeping the house and keeping the clothes washed and meals on the table and seeing after the child?" he replied: "She neglected it. She would do it if I fussed at her enough and got her mad enough she would do it. As I said, her mother and sister came up and cleaned my house, and when she would be off on Wednesday afternoon she would go to town and shop or something and would not try to keep it livable. Instead of her seeing after her own home, her mother seen after it for her."

In regard to the necessity of his wife working, he stated: "I admit I didn't make enough for her to go on." The evidence showed that the wife worked in the office of the Comptroller General for several years and went back and forth from Lawrenceville to Atlanta. For some time before the separation she had a full-time job with a law firm in Lawrenceville, where she was required to work until about 8 p. m. on an average of two nights a week. Her mother would provide meals for her husband and

child when she was unable to get home, and would clean her house for her at least once a week. The husband was willing for his wife to work, but he complained that she did not keep the house and child clean.

From all of his testimony it appeared that the final cause of the husband's separation from his wife was the fact that she came in at 1 a.m. one morning after going to a show with some women friends, and getting her hair dressed after the show. He admitted on cross examination that he had given his wife permission to go to the show. He testified that on this occasion he had locked the door and when his wife returned he "told her to go and stay where she had stayed the first part of the night and spend the rest of the night there," that he refused to let her in, and she had to cut the screen to get in. He stated: "At the time I told her at 1 o'clock, I told her then it was the end, and she lived there another solid week and I admit I had nothing to do with her, because I told her it was the end on Friday night, . . ."

The evidence did not show "the wilful infliction of pain, bodily or mental, upon the complaining party, such as reasonably justifies apprehension of danger to life, limb or health." Code Ann. § 30-102 (10); Stimpson v. Stimpson, 213 Ga. 235 (2) (98 SE2d 559), and cases cited. It was error to deny the motion for new trial.

Judgment reversed. All the Justices concur.